

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-15-00300-CV

IN THE INTEREST OF I.C., N.C.,
A.C., AND D.C., CHILDREN

----------

FROM COUNTY COURT AT LAW NO. 1 OF PARKER COUNTY
TRIAL COURT NO. CIV14-0275

----------

## MEMORANDUM OPINION[1]

----------

After a trial, a jury found by clear and convincing evidence that the parent-child relationships between Appellant C.R. (Mother) and children I.C., N.C., A.C., and D.C. and between Appellant D.C. (Father) and each of the four children should be terminated. The trial court found by clear and convincing evidence that Mother and Father had knowingly placed or knowingly allowed the four

[1]*See* Tex. R. App. P. 47.4.

children to remain in conditions or surroundings which endangered their physical or emotional well-being; had engaged in conduct or knowingly placed their children with persons who engaged in conduct which endangered the children's physical or emotional well-being; and had failed to comply with the provisions of a court order that specifically established the actions necessary for the return of the children, who had been in the permanent or temporary managing conservatorship of the Texas Department of Family and Protective Services (TDFPS) for not less than nine months as a result of the children's removal from Mother and Father under chapter 262 for the abuse or neglect of the children.[2] The jury implicitly found and the trial court explicitly found by clear and convincing evidence that termination of the parent-child relationships between the children and Mother and Father was in the children's best interest.[3] The trial court terminated the parent-child relationships between the children and Mother and Father, and Mother and Father timely appealed.

In five issues, Mother contends that the evidence is legally and factually insufficient to support termination; that the trial court abused its discretion by improperly commenting on Father's credibility and the weight of the alleged hearsay offered through the play therapist; that the trial court erred by denying

---

[2]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O) (West Supp. 2015).

[3]*See id.* § 161.001(b)(2).

Mother's motion to strike and motion for mistrial regarding said alleged hearsay; and that her trial counsel was ineffective by failing to properly object to the trial court's improper comments, certain inadmissible hearsay, and improper argument. Father adopts those five issues by reference[4] and also raises eight other issues challenging the legal and factual sufficiency of the evidence supporting the termination of his parental rights, the trial court's admission of alleged hearsay, the jury charge, and the number of jurors on the jury and contending that the trial court violated his rights to a fair trial and due process by sua sponte compelling a demonstration by Father and commenting on the evidence, his credibility, Father's counsel's performance and ethics, and the weight of the evidence offered against Father. Because we hold that the evidence is sufficient to support termination, that the trial court did not reversibly err, and that Mother did not prove that her trial counsel committed ineffective assistance of counsel at trial, we affirm the trial court's judgment terminating both parents' parental rights.

## I. Sufficiency of the Evidence to Support Termination

In her first two issues, Mother challenges the endangerment findings against her, the no-compliance finding against her, and the best interest finding against her. In his first three issues, Father challenges the endangerment, no-compliance, and best interest findings against him.

---

[4]*See* Tex. R. App. P. 9.7.

3

### A. Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.[5] Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures."[6] We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.[7]

Termination decisions must be supported by clear and convincing evidence.[8] "[C]onjecture is not enough."[9] Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'"[10] Evidence is clear and convincing if

---

[5]Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

[6]*In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

[7]*In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

[8]*See* Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 802; *see also* Tex. Fam. Code Ann. § 161.206(a) (West 2014).

[9]*E.N.C.*, 384 S.W.3d at 810.

[10]*E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802.

it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[11]

For a trial court to terminate a parent-child relationship, TDFPS must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child.[12]  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.[13]

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven.[14]  In this case, then, we determine whether the evidence is such that the jury could reasonably form a firm belief or conviction that TDFPS proved the subsection (D), (E), or (O) termination ground and that termination of

---

[11]Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

[12]Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

[13]*Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

[14]*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

the parent-child relationships between both parents and the four children is in the children's best interest.[15]

We review all the evidence in the light most favorable to the finding and judgment.[16] We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so.[17] We disregard all evidence that a reasonable factfinder could have disbelieved.[18] We consider undisputed evidence even if it is contrary to the finding.[19] That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.[20] "A lack of evidence does not constitute clear and convincing evidence."[21]

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province.[22] And

---

[15] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2).

[16] *J.P.B.*, 180 S.W.3d at 573.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *See id.*

[21] *E.N.C.*, 384 S.W.3d at 808.

[22] *J.P.B.*, 180 S.W.3d at 573–74.

6

even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.[23]

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship.[24] In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own.[25] We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D), (E), or (O) of section 161.001(b)(1) and that termination was in the children's best interest.[26] If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.[27]

---

[23] *Id.* at 573.

[24] *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014).

[25] *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

[26] *See* Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[27] *H.R.M.*, 209 S.W.3d at 108.

**B. Endangerment Findings: Law and Application to Facts**

TDFPS's Exhibit 7, the family service plan, was admitted into evidence at trial without objection or limitation while TDFPS was questioning Father. The exhibit includes the following language,

On March 26, 2014 [TDFPS] received a priority 1 intake alleging physical abuse of [the four children] by [Mother] and [Father] and physical abuse of [A.C.] by [Uncle D]. It was alleged that [A.C.] was seen with a fist bruise on the left side of his head and that the injury was not consistent with [F]ather's explanation. [A.C.] complained of pain at the site of the injury but was not taken to the doctor. It was also alleged that [A.C.] sustained a quarter sized red cut on the top of his head. While [F]ather stated that the injury occurred after a jewelry box fell on [A.C.'s] head, [A.C.] and [N.C.] stated that [F]ather hit [A.C.] in the head with a hammer, causing the injury. [D.C.] II has 3 green dots tattooed on his right wrist. It was alleged that [N.C.] had a fist sized bruise on her back. [Mother] and [Father] claimed that the injury was sustained when the children were fighting; however, [N.C.] stated that she was struck in the back by [Father]. [A.C.] has a scar on his back that looks like he was branded with the top piece of a lighter. [A.C.] stated that this was done by Uncle D. It is unknown if the children have old injuries; however, [D.C.] II, [A.C.], and [N.C.] have several scars, especially [A.C]. . . .

. . . .

The level of concern for child vulnerability is extreme because of the following reasons: The children are under the age of five and are[,] therefore, unable to protect themselves. The children also appear to fear retribution from [Father].

The level of concern for caregiver capability is extreme because of the following reasons: [Father] and [Mother] appear to lack knowledge of child development and significantly lack the parenting skills needed to meet the children's behavioral and developmental needs. The discipline practices of [Father are] violent, out of control, and disproportionately harsh compared to the misbehavior, as he hit [A.C.] in the head with a hammer after he

8

defecated in the closet. [Father] was also recently arrested for assault causing bodily injury to a family member.

The level of concern for quality of care is extreme because of the following reasons: [Mother] lacks empathy towards the children by believing [Father's] story over what the children tell her. The children have been left with an inappropriate caregiver, [Father], after [he] assaulted [Mother]. [A.C.] did not receive medical treatment either time he received a head injury. . . .

The level of concern for maltreatment pattern is extreme because of the following reasons: [A.C.] has received harm that is inflicted (non-accidental) and was serious. Hitting the children in the head and putting them in the dryer is bizarre maltreatment. [Father]'s and [Mother]'s explanation[s] of [A.C.]'s injuries are inconsistent with the . . . injuries. Originally, the only concern was that [A.C.] had been hit in the head with a hammer; however, it was later discovered that the children were being put in the dryer and the dryer was being turned on while they were in there.

The level of concern for the home and social environment is considerable because of the following reasons: . . . [Father]'s violent behaviors expose the children to danger. [Mother] has been a victim of family violence. [Father] currently faces criminal charges for assault causing bodily injury to a family member.

The level of concern for response to intervention is considerable for the following reasons: [Father] and [Mother] take the allegations less serious than D.F.P.S. Both [Father] and [Mother] also offered implausible explanations, in an attempt to deliberately mislead C.P.S.

The level of concern for protective capacities is extreme for the following reasons: [Mother] appears unwilling to protect the children from [Father]. There is a lack of support network that could help ensure the safety of the children and provide adequate supervision of the children. [Mother] rejects necessary protective interventions, as she allowed [Father] to supervise the children despite a protective order that stated she was not to do this.

Father's cousin L.G. testified that one summer day in 2012, 2013, or 2014, she saw a welt on Mother's arm. Mother told L.G. that Father had hit her with a

9

metal chain, causing the welt. Later that day, L.G. witnessed an altercation between Mother and Father. They argued, and then Father hit Mother's head multiple times with a steel-toed boot. L.G.'s disabled brother and mentally ill younger brother saw the assault; L.G. testified that Mother and Father's children were also in the room during the assault but that she believed they were asleep. L.G. testified that the next day, Mother's face was so swollen and her right eye was so bloody that she looked like the character E.T. L.G. testified that Mother had also told her of a time when Father had slapped Mother in Azle.

L.G. testified that she believed the children were disciplined "[a] little much, but not as bad as what happened . . . with [A.C]."

K.C., Father's sister, testified that in August 2012, after Mother was struck in the head with a boot by Father, Mother called to tell K.C. K.C. drove from her home in Weatherford to Mother's home in Granbury and insisted that Mother go to the hospital. But Mother "said that she wanted to go to Weatherford so that it could be as if she [had been] with [K.C.]" K.C. complied with Mother's wishes and drove her to the Weatherford hospital. K.C. heard Mother tell hospital personnel that she had fallen while helping K.C. move things in her Weatherford home. Mother was diagnosed with a concussion and received six staples to close her head wound. When K.C. drove Mother back to her Granbury home, K.C. saw that I.C. appeared scared and withdrawn, which was not his usual demeanor, and she took him home with her.

S.K., Father's cousin, testified that she went to the family's home a couple of days later and saw Mother and the four children in the living room. Mother's face was badly bruised, and one of her eyes was very red and contained clotting blood. Mother told S.K. that she and Father had argued, she had thrown a shoe at him, and then he had beaten her with a steel-toed boot. Mother told S.K. that the children and L.G. had witnessed the assault. S.K. saw that a long cut on Mother's head had been mended with staples. S.K. also testified that Mother had told her that Father had hit her with a metal dog chain during the same incident.

S.K. testified that Mother had admitted that she had asked another relative to take her to the Weatherford hospital, where she made up a story to avoid incriminating Father, who was already on probation. S.K. asked why Mother did not leave Father, and Mother told her that she could not leave the children without a father. S.K. also testified that "pretty much everybody in the family offered [Mother] somewhere to stay if she left [Father]."

S.K. testified about another incident in which she heard Mother and Father fighting behind a locked door. When the door opened, Mother was crying and stated that Father had just choked her. S.K. saw red marks around Mother's neck.

S.K. testified that Mother had told her that Father had a tattoo gun and gave then one-year-old I.C. the tattoo of three green dots on his finger. S.K. additionally testified that Father and Mother told her that Father had made the

11

tattoo gun. Father testified that he thought a roommate had given the child a tattoo when Father went outside to smoke a cigarette.

S.K. also testified that I.C. told S.K.'s mother that Father had hit A.C. on the head with a hammer. S.K.'s mother told S.K., and she reported the incident to CPS. CPS removed the children from the home the following day, March 26, 2014, and the parents voluntarily placed them with S.K. and her husband. A.C.'s story to S.K. regarding the cause of the mark on his head was consistent with S.K.'s mother's story. None of the children ever told S.K. anything different about the cause of the injury. Father told S.K. that a wooden box fell on A.C.'s head when he was trying to climb up a dresser to retrieve "a DVD or something like that." Mother testified that A.C. told her a similar story the night of the incident, but she admitted that she never questioned him alone.

On February 21, 2014, Mother had told the police in writing that Father had hit her with a toy and his hand. He was then arrested for assault with bodily injury to a family member. Mother testified that she lied to the police about the assault because she was mad at Father, whose brother had told her that Father was cheating on her while she was at work. A magistrate entered an emergency protective order against Father. Mother did not honor the protective order, inviting Father back to the home after a couple of weeks. Both Mother and Father testified that the reason Father moved back home was that she needed help with the children.

12

Mother and Father both denied that Father had ever been abusive with her, and Mother denied that she had ever told anyone that he had hit her except the police in the incident described above. Mother also testified that she knew that the children had accused Father of hitting them but that she did not believe they were telling the truth. Father likewise denied allegations that he had abused the children.

The children's play therapist, Cheryl Bullock, testified that she began treating the children about three months after they were removed from their parents. Bullock testified that on July 7, 2014, which she believed was their second therapy session, N.C. and A.C. each separately reported "[b]eing put in a dryer and [it] being turned on." A.C. "said [that he] was put in [a] dryer and banged around." A week later, "[h]e said [A]unt said we [are] going back to [D]ad. . . . He put me in dryer. Aunt said . . . [D]ad can't hit me." On August 4, 2014, when A.C. was three years old, he saw the toy hammer and nails in a therapy session "and kind of stared at it and then he told [Bullock] about the hammer." Specifically, "He said my daddy hit me with a hammer. My head [was] bleeding and I was scared. Police took [D]addy and [the] hammer. I don't want to go back." On August 25, 2014, N.C. told Bullock that "Dad hit [A.C.] with [the] hammer. His head was bleeding." That same day, I.C. told Bullock, "[D]addy put me in the dryer. He shut the door and turned it on. I was bad so [D]addy put me in there." On October 13, 2014, N.C. told Bullock that she "was put in [the] dryer with [her] brothers" and that it "hurt [her] knees and brothers' knees." N.C. also

13

told Bullock that she had told Mother what Father had done and that Mother "told [D]addy not to do that. He got mad and hurt her." On October 27 or 28, 2014, I.C. told Bullock that "his dad[] hit [A.C.], his brother, on the back several times." On December 29, 2014, A.C. told Bullock that "Dad hit [M]ommy and she cried. I was scared."

On June 8, 2015, A.C. told Bullock, "I'm mad at [D]addy. I don't love [M]ommy." Bullock testified that on June 22, 2015,

> [N.C.] was not wanting to play with her toys. She was scared of all of them, I think, except of her Elsa doll. And she had watched a movie of Chucky, and it's a doll that comes to life. I think he's— might be, I don't know what you call it, but anyway a serial killer embodied him and he kills people.

Bullock testified that the other children basically said "that they watched it for disciplinary reasons." N.C. told Bullock, "[W]e watched it at [D]addy's and he ma[d]e us watch it. I don't like it. I [am] scared my dolls will get me. I only play with [my] Elsa doll."

Bullock testified that the children had never told her that Mother hurt them in any way, that in therapy sessions immediately following an overnight visit with parents, she never saw any visible injury, and that the children stated many times that they loved Mother.

The jury also heard evidence of Father's many run-ins with the law, including periods of confinement.

As this court has often discussed,

14

Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

. . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act . . . .

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's wellbeing may be inferred from parental misconduct alone . . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

. . . .

We have also stated that abusive or violent conduct by a parent may produce an environment that endangers the child's physical or emotional well-being.[28]

Further, "even though imprisonment alone does not prove that a parent engaged

in a continuing course of conduct that endangered the physical or emotional well-

---

[28] *In re M.N.*, No. 02-14-00404-CV, 2015 WL 3458315, at *1 (Tex. App.—Fort Worth May 28, 2015, no pet.) (mem. op.) (internal quotations marks omitted) (quoting *In re S.G.*, No. 02–14–00245–CV, 2015 WL 392772, at *5 (Tex. App.—Fort Worth Jan. 29, 2015, no. pet.) (mem. op.), and *In re L.E.M.*, No. 02–11–00505–CV, 2012 WL 4936607, at *2 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (mem. op.)).

being of his child, it is nevertheless a factor that we may properly consider on the issue of endangerment."[29]

While they also heard Father's and Mother's denials of any domestic violence, the jury heard evidence that Father had abused Mother and the children on multiple occasions and that Mother alternately reported and minimized his treatment of her to others but did nothing to protect her children from his known propensity for violence. The jury also heard about the multiple occasions that Father was absent from the home because of his incarceration. The jury is the sole judge of the credibility of the evidence.[30] We therefore hold that the evidence is legally and factually sufficient to support the endangerment findings under subsections (D) and (E) against both Mother and Father.

## C. Best Interest Findings

### 1. The Law

There is a strong presumption that keeping a child with a parent is in the child's best interest.[31] We review the entire record to determine the child's best interest.[32] The same evidence may be probative of both the

---

[29] *In re G.H.*, No. 02-14-00310-CV, 2015 WL 1262627, at *2 (Tex. App.— Fort Worth Mar. 19, 2015, no pet.) (mem. op.) (citation and internal quotation marks omitted).

[30] *See J.P.B.*, 180 S.W.3d at 573.

[31] *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[32] *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

subsection (1) ground and best interest.[33]   Nonexclusive factors that the

trier of fact in a termination case may also use in determining the best

interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the
        future;

(C)     the emotional and physical danger to the child now and in the
        future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote
        the best interest of the child;

(F)     the plans for the child by these individuals or by the agency
        seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the
        existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.[34]

These factors are not exhaustive; some listed factors may be inapplicable

to some cases.[35]   Furthermore, undisputed evidence of just one factor may be

---

[33]*Id.* at 249; *C.H.*, 89 S.W.3d at 28.

[34]*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

[35]*C.H.*, 89 S.W.3d at 27.

sufficient in a particular case to support a finding that termination is in the best interest of the child.[36]  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[37]  That is, "[a] lack of evidence does not constitute clear and convincing evidence."[38]

### 2. Application to the Facts

At trial, the children were ages six, five, four, and three years.  It was clear from Mother's testimony that she was bonded to each of her children.  Bullock testified that the children loved their parents and that the children stated many times that they loved Mother.

The children lived with Father's cousin S.K. and her husband for several months after the removal.  S.K. testified that the children told her that they loved their parents and wanted to go home.  N.C. accused S.K.'s husband of inappropriate discipline.  N.C. told Bullock that she lied about S.K.'s husband hitting her so she could go home.

The CPS conservatorship worker, Amanda Rodriguez, who had been the family's only conservatorship worker, testified that she believed that the parents and children loved each other.  She further testified that during visits, the children

---

[36] *Id.*

[37] *Id.*

[38] *E.N.C.*, 384 S.W.3d at 808.

18

showed their affection physically and the parents showed their love by bringing the children toys and food and positively interacting with them.

Rodriguez also testified that based on her communications with the children and her observations of them, they were ready for a permanent resolution in the case. She admitted that termination would have a "significant impact on these children" because they loved their parents and "want[ed] their parents to be their parents[.]" Rodriguez testified that the children could overcome that hurdle with "a supportive, loving family," continued therapy, and "a really good support system."

Bullock testified that she saw significant progress in the children over the fourteen months of therapy before trial. She believed that I.C. and N.C. made the most progress. She stated that I.C., who had been very reserved, opened up enough to laugh after accidentally flicking paint on her. D.C. became more verbal.

Rodriguez agreed that sixteen months after the children originally came into care, I.C. was less fearful, more open, and more talkative. She also said that he did not like the tattoo and that TDFPS intended to have it removed if the parents' rights were terminated. Rodriguez testified that A.C. and N.C. were "always . . . pretty verbal" and "willing to speak their mind" so had not "changed as much." She stated that D.C. "ha[d] definitely become more verbal and more active." Rodriguez stated that the children thrived in school, were very eager to learn, and therefore needed someone who would encourage them in school and

19

support them. She also stated that the children needed love, nurturing, respect, and safety in addition to having their basic needs met and that those needs would be at risk of not being met if the children were returned to the parents. Rodriguez testified that some of the children had eczema but no other special needs.

Rodriguez testified to having concerns because neither parent ever acknowledged domestic abuse, other than Mother's repudiated statement to the police, nor did they acknowledge child abuse. Rodriguez testified that while Father told her that he completed anger management, he did not provide proof of completion before trial. Father did provide evidence of completion at trial. Rodriguez also testified that the parents finished counseling but did not address the key issues. She testified, "[I]f the parents indicate that there are no issues to be addressed, then it's very difficult, often impossible, for the provider to help them make progress on something they are told doesn't exist." Rodriguez testified that she had indicated when she made the counseling referral that she wanted Father and Mother to work on domestic violence issues, appropriate parenting, and "any kind of interpersonal relationships that [could] be affecting their ability to safely parent their children." Rodriguez testified that TDFPS never felt like the children would be safe being returned to the parents full-time. She also testified that she believed the children would be in danger if they were returned to their parents. She identified Father's hitting A.C. in the head with a

20

hammer and putting the children in the dryer as "the biggest concern[s] in this case."

Rodriguez testified that during CPS-supervised visits, neither parent was attentive enough to a potty-training child or a child in diapers. She also testified that the children, who were normally "very lively and active," and "[e]ven rambunctious at times," "would sit very still" in visits with Father. "They were very quiet." It seemed to Rodriguez that "they were afraid." On the other hand, Rodriguez testified that in Mother's visits with the children, the children were more themselves, but Mother "appeared to be very overwhelmed" when they were excited or misbehaved and would end up giving up on her attempts to discipline and just ignore the behavior. Rodriguez saw no increase in Mother's ability to apply skills she should have learned in her parenting class.

Bullock testified that the children regressed some as access between the parents and children increased, with the most regression occurring when the overnight or weekend visits occurred, culminating in Bullock making a report to CPS at the end of October 2014 based on I.C. telling her that Father hit A.C. on the back several times during their weekend visit with the parents.

Rodriguez testified that TDFPS's ongoing concern about Father was "that he [was] unable to take responsibility for his role in the removal" and "that it d[id] not appear that he ha[d] gained protective capacities . . . to safely parent his children."

Rodriguez testified that even though the children were in two separate foster homes at trial, TDFPS's plan was relative adoption in one home. She stated that two families were interested in being considered for placement upon termination of the parents' rights: Father's cousin S.K. and her husband, who had taken the children into their home for more than a year after CPS initially got involved, and the B. family, Father's aunt's family. Rodriguez admitted that she had heard S.K. testify that she did not wish to adopt the children and that originally, the B. family had indicated that it could not take all the children. Rodriguez maintained that TDFPS had no wish to have permanent conservatorship of the children forever and would continue to focus on finding the children a single home.

The jury could have properly concluded from the evidence that if the children were returned to their parents, Father would continue to abuse the children, unchecked by Mother, whom the jury could have also properly concluded was a victim of domestic violence who chose to remain with Father, despite their brief separation beginning shortly before trial. Given the children's young ages and lack of significant needs or special issues, the jury could also have properly concluded that they were readily adoptable. Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the best interest findings.

## D. Conclusion on Sufficiency Issues

We overrule Mother's first two issues as to the endangerment and best interest findings and Father's first and second issues as to those findings. Because the case was submitted to the jury in broad form, we need only find the evidence sufficient to support a single statutory ground for termination that was submitted to the jury and to support the best interest findings to uphold the termination judgment.[39] We therefore do not reach the remainder of Mother's first two issues or Father's third issue challenging the trial court's findings that the parents failed to comply with a court order.[40]

As to Father's adoption of Mother's first two issues, even if he could properly attack the termination findings against Mother, which we do not hold,[41] he failed to challenge the sufficiency of the evidence supporting the jury findings against Mother in his amended motion for new trial and therefore did not preserve error.[42] We therefore also overrule Mother's first two issues as adopted by Father.

---

[39] *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re D.N.*, 405 S.W.3d 863, 872 (Tex. App.—Amarillo 2013, no pet.).

[40] *See* Tex. R. App. 47.1.

[41] *See In re T.N.*, 142 S.W.3d 522, 524–25 (Tex. App.—Fort Worth 2004, no pet.).

[42] *See* Tex. R. App. P. 33.1(a); *Citigroup Glob. Mkts. Realty Corp. v. Stewart Title Guar. Co.*, 417 S.W.3d 592, 594 n.1 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

## II. Evidentiary Issues

Mother complains in her fourth issue and Father complains in his first, second, and fifth issues about the admission of play therapist Bullock's testimony and notes about the children's statements of abuse by Father, and Father also complains in his fourth issue about the admission of Mother's statements to family members about his abuse of her.

### A. Bullock's Testimony Repeating Children's Comments

#### 1. Section 104.006 hearing

Within his first two issues, Father complains that the trial court erred by not conducting a family code section 104.006 hearing regarding the children's comments repeated by Bullock in her testimony.[43]  But Father did not object to or seek to limit the admissibility of TDFPS's Exhibit 7, which contained the same or similar information as that derived from the children's statements—Father hit A.C. on the side of his head, causing a bruise and pain; Father hit A.C. in the head with a hammer, causing a quarter-size cut; Father hit N.C. in the back, causing a fist-sized bruise; Father put children in the dryer and turned it on. "[U]nobjected-to hearsay is, as a matter of law, probative evidence."[44]  Further, when evidence that is identical or similar to the objected-to evidence is admitted

---

[43] *See* Tex. Fam. Code Ann. § 104.006 (West 2014).

[44] *Tex. Commerce Bank, Nat'l Ass'n v. New*, 3 S.W.3d 515, 516 (Tex. 1999); *see* Tex. R. Evid. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay."); *City of Keller v. Wilson*, 168 S.W.3d 802, 812 n.29 (Tex. 2005).

elsewhere without objection, there is no harm.[45]  We therefore overrule the remainder of Father's first and second issues.

## 2. Rule 803(4)

In his fifth issue, Father contends that the children's out-of-court statements reported by Bullock do not qualify as a hearsay exception under rule of evidence 803(4).[46]  Again, the same or similar information was admitted without objection or limitation in TDFPS's Exhibit 7.  Thus, even if the trial court abused its discretion by admitting Bullock's testimony and notes containing the children's statements, a holding we do not reach, Father can show no harm.[47] We overrule his fifth issue.

## 3. Mother's Motion to Strike and Motion for Mistrial

In her fourth issue, Mother contends that the trial court abused its discretion by denying her motion to strike and motion for mistrial based on Bullock's testimony about the statements that the children made to her.  Mother did not object on the first day of Bullock's testimony.  On the second day, when

---

[45]*In re W.J.H.*, 111 S.W.3d 707, 714 (Tex. App.—Fort Worth 2003, pet. denied); *see Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008).

[46]*See* Tex. R. Evid. 803(4).

[47]*See Reliance Steel & Aluminum Co.*, 267 S.W.3d at 873; *W.J.H.*, 111 S.W.3d at 714; *see also Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007); *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004).

Bullock's notes were introduced, Mother objected to the lack of proper foundation to TDFPS's Exhibits 20 and 21 but withdrew her objection to at least Exhibit 21 and possibly to both exhibits after TDFPS provided more predicate evidence; the record is unclear. Regardless, Mother made no other objections regarding the testimony about the children's statements.

On the day following the completion of Bullock's testimony, Father filed a motion for reconsideration challenging the admissibility of her testimony regarding the children's statements. During the arguments on that motion, Mother's attorney stated,

> Your Honor, it is my recollection that a 104.006 hearing was requested and—or offered, one or the other, and denied by the court. And therefore I understood that there was an implicit finding of reliability in the children's statements. And based on my research of the case law I determined that based on that implicit ruling, in my mind, anyway, and the case law on 702, 703, I did not make an objection; however, I was also not in possession of the *Taylor* case.

> I was given a copy of the *Taylor* case at the close of the testimony, I have now had a chance to review that case, and I believe that it is probable that an appellate court could overturn and send us back to a new trial on the admission of that evidence. So I'd ask the court to, at the very least, grant a[n] instruction to the jury that they not consider the hearsay statement evidence. But I would prefer a mistrial.

In the interest of justice, we will treat this as Mother's motion to strike and motion for mistrial. The trial court did not explicitly rule on Mother's oral requests. Ultimately, the trial court denied Father's motion, which we will treat as an implicit denial of Mother's oral motion.

26

Mother did not object at all when the testimony was admitted, and she cannot rely on Father's objection.[48]  Urged only after all Bullock's testimony about the children's statements had been admitted with no objection by Mother, Mother's motion to strike or for mistrial regarding the testimony was untimely and did not preserve error.[49]  Additionally, as to her entire issue, because TDFPS's Exhibit 7 was admitted without objection or limitation and contains the same damaging information about the abuse of the children as Bullock's testimony and notes, any error would be harmless.[50]  We overrule this issue and, because of the admission of TDFPS's Exhibit 7 with no objection or limitation, Father's adoption thereof.

## B.  Mother's Out-of-Court Admission

In his fourth issue, Father contends that the trial court abused its discretion by admitting Mother's statements made to third parties against him over his objection and by denying his request that the jury be admonished that they could not consider such evidence against him.  But Father does not direct us to any

---

[48]*See, e.g.*, *In re T.H.*, No. 02-07-00464-CV, 2008 WL 4831374, at *7 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.); *Howard v. Phillips*, 728 S.W.2d 448, 451 (Tex. App.—Fort Worth 1987, no writ).

[49]*See* Tex. R. App. P. 33.1; Tex. R. Evid. 103(a)(1); *In re A.B.G.*, No. 09-11-00545-CV, 2013 WL 257311, at *5 (Tex. App.—Beaumont Jan. 24, 2013, no pet.) (mem. op.); *Farm Servs. Inc. v. Gonzales*, 756 S.W.2d 747, 750 (Tex. App.—Corpus Christi 1988, writ denied).

[50]*See Bay Area Healthcare Grp., Ltd.*, 239 S.W.3d at 235; *Volkswagen of Am., Inc.*, 159 S.W.3d at 907.

place or places in the record where he so objected or requested. We therefore overrule this issue as inadequately briefed.[51]

## III. Improper Comments by Trial Court

In her third issue, Mother contends that the trial court erred by improperly commenting on Father's credibility and "the weight of the hearsay offered through" Bullock. Mother complains about two particular instances. One instance occurred as Father was testifying about the tattoo that evidence showed I.C. received either when he was one year old or when he was about three years old:

> Q. So you think the tattoo—those three circles on your son's wrist, you think that just took a couple of seconds?
>
> A. I mean, I'm guessing that.
>
> Q. [Father], based on your experience getting tattoos don't you think it took longer than that?
>
> A. No.
>
> Q. How old was your son when that happened to him?
>
> A. He was about three.
>
> Q. Do you think that hurt him?
>
> A. I asked him. But, I mean, he didn't really talk about it.
>
> [Ad litem]: Objection. Nonresponsive.

---

[51] *See Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994); *Hall v. Stephenson*, 919 S.W.2d 454, 466–67 (Tex. App.—Fort Worth 1996, writ denied); *see also Tello v. Bank One, N.A.*, 218 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Q. . . . Do you think that hurt him?

A. Yes.

THE COURT: Can you hold your breath for three seconds?

[A.]: Yes.

THE COURT: Let's see you hold your breath for as long as it takes to put three circles on somebody's fingers with tattoos. Take a big deep breath and hold it while we put the tattoo on.

[A.]: I was only out less than five minutes.

THE COURT: No, you said it takes less than three seconds to put the tattoo on your son's hand. I want to see if you can hold your breath long enough to put a tattoo on. You can't do it, can you?

[A.]: I can hold my breath, but I'm not sure what you're asking.

THE COURT: Yeah, you are. Go ahead.

The other instance occurred as Father's trial counsel objected to the admission of the children's statements through their play therapist:

Q. So I'm going to ask you again, when did [A.C.] talk about the hammer?

A. It was August the 4th, 2014.

Q. What did he say?

[Father's counsel]: Again, Your Honor, I would object. Calls for hearsay. I don't think there's been a predicate laid as to [A.C.] as a credible source at that particular time. And the validity and reliability of the statement, I don't think, has been satisfied. I think the court is required to have a special hearing on that.

THE COURT: Don't forget to say it's very prejudicial to your client.

[Father's counsel]: I'm sorry?

29

THE COURT: Don't forget to say it's very prejudicial to your client. Overruled.

[Father's counsel]: Your Honor, may we approach?

THE COURT: No.

[Father's counsel]: Your Honor, I respectfully move for a mistrial. Court's last comment is unique in my 46 years of practicing law, and I think it's inappropriate and I can't allow my client to let that go. So I would move for a mistrial at this time.

THE COURT: Denied.

Mother did not timely object to either comment. "[O]bjection to a trial court's alleged improper conduct or comment must be made when it occurs if a party is to preserve error for appellate review, unless the conduct or comment cannot be rendered harmless by proper instruction."[52] While Mother argues that the trial court's comments were incurable by instruction and required no objection, she does not "explain how any comments made by the trial judge were incurable or would excuse [her] failure to preserve error."[53] Additionally, her motion to recuse the judge and motion for mistrial, filed the next day, were not timely to preserve this complaint about the comments.[54] We note that Mother does not complain about the denial of her motion to recuse. We overrule Mother's third issue.

---

[52] *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *see* Tex. R. App. P. 33.1.

[53] *See* Tex. R. App. P. 33.1; *Dow Chem. Co.*, 46 S.W.3d at 241.

[54] *See* Tex. R. App. P. 33.1; *Dow Chem. Co.*, 46 S.W.3d at 241.

30

Father has adopted by reference Mother's briefing of her third issue, but he did not object that the trial court improperly commented on the tattoo evidence. He therefore did not preserve that complaint.[55]  Father did, however, preserve his complaint in the second exchange quoted above.  Father's trial counsel stated his often repeated objection to Bullock's testimony:

> Again, Your Honor, I would object.  Calls for hearsay.  I don't think there's been a predicate laid as to [A.C.] as a credible source at that particular time.  And the validity and reliability of the statement, I don't think, has been satisfied.  I think the court is required to have a special hearing on that.

The trial court stated, "Don't forget to say it's very prejudicial to your client." Father's counsel queried, "I'm sorry?" and the trial court repeated, "Don't forget to say it's very prejudicial to your client.  Overruled."  Father's counsel then moved for a mistrial based on the comment, and the trial court denied the motion. As the Supreme Court of Texas has explained,

> The United States Supreme Court, when presented with similar allegations of judicial bias, has determined that judicial rulings alone almost never constitute a valid basis for a bias or partiality motion, and opinions the judge forms during a trial do not necessitate recusal unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  Further, not establishing bias or partiality are expressions of impatience, dissatisfaction, annoyance, and even anger.  A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.  In short, a trial

---

[55] *See* Tex. R. App. P. 33.1; *Dow Chem. Co.*, 46 S.W.3d at 241.

court has the inherent power to control the disposition of cases with economy of time and effort for itself, for counsel, and for litigants.

Similarly, Texas courts have held that the discretion vested in the trial court over the conduct of a trial is great. A trial court has the authority to express itself in exercising this broad discretion. Further, a trial court may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time.[56]

Mother's argument, as adopted by Father, is that the trial court's comments were a comment on the weight of the evidence because the trial court indicated an opinion on the truthfulness of the evidence. As the State points out in its response to Mother's brief, however, it is just as likely that the trial court was sarcastically commenting on trial counsel's wordiness. Regardless, given the totality of the evidence against Father, we hold that Father has not shown that this comment of the trial court probably caused the rendition of an improper judgment against Father.[57] We therefore overrule Father's adopted third issue.

In his sixth issue, Father contends that he "did not receive a fair trial and due process of law because of the Trial Court's comments on evidence and

---

[56]*Dow Chem. Co.*, 46 S.W.3d at 240–41 (citations, internal quotation marks, and internal quotation alteration marks omitted).

[57]*See* Tex. R. App. P. 44.1(a); *In re M.R.J.M.*, 280 S.W.3d 494, 501 n.7 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *Metzger v. Sebek*, 892 S.W.2d 20, 39 (Tex. App.—Houston [1st Dist.] 1994, writ denied).

display of animosity toward Father and his Counsel." Father cites no legal authority for his contentions. We therefore overrule his sixth issue.[58]

## IV. Jury Charge

In his seventh issue, Father contends that the trial court committed jury charge error by defining "direct evidence," instructing the jurors on the preponderance-of-the-evidence burden of proof, and omitting the phrase "strong presumption" concerning the rights of parents and children. We review a jury charge for an abuse of discretion.[59] A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable.[60] An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances.[61]

### A. Direct Evidence Instruction

Father objected to part of the following instruction:

---

[58] *See* Tex. R. App. P. 38.1(i); *Hall*, 919 S.W.2d at 467; *see also Fredonia State Bank*, 881 S.W.2d at 284–85.

[59] *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g); *see In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000).

[60] *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

[61] *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

Father's objection was:

[T]here is a definition given in this proposed jury instruction that doesn't seem right to me. It's a definition of what is direct evidence. And it says direct evidence is evidence that's proved by a document. And I tried—I saw that or at least recognized it for the first time this morning. Spent an hour and a half trying to find a good definition for what is direct evidence. And I've asked the court reporter if she had something that defined that, and she wasn't able to find it.

I was not looking through the pattern jury instructions for CPS. I have all the ones for criminal law and couldn't find it there. Not to say it's not there, I just couldn't find it.

And—but in this case it would be in my opinion error to instruct the jury that a document is, if I may—

. . . .

. . . . I don't have the final product. But it says if acts established by direct evidence have been proved by documentary evidence or by witnesses who saw the act done or heard the word spoken. I don't think just because something is in a document makes it direct evidence.

And particularly in this case the court admitted into evidence copies of notes taken by Ms. Bullock that included statements made outside the court, obviously in her session, by one or several of the children at various times.

So my objection was hearsay and hearsay on hearsay. But to call it direct evidence of anything, I think, is misapplication of my understanding of direct evidence. Direct evidence, I would think, would be that is provided by witnesses who were percipient to what was happening. And anything else is circumstantial evidence.

Father cites no legal authority for his contention that the trial court erred by giving the instruction; we therefore overrule this complaint as inadequately briefed.[62] We note, however, that the instruction is the pattern jury charge instruction for circumstantial evidence.[63]

## B. Proof by a Preponderance of Evidence

Referencing only *Santosky* and "Due Process," Father also complains of the managing conservatorship questions, contending that they reference the wrong burden of proof. The jury did not reach these questions. Father has therefore shown no harm.[64] In the interest of justice, we note that the questions reflect the proper burden of proof for issues of conservatorship.[65]

## C. Omission of Instruction on Strong Presumption

Finally, Father complains that the trial court failed to instruct the jury that there is a "[s]trong presumption that the best interest of the child is served by keeping a child with a parent." While he cites the case that line is taken from,[66]

---

[62]*See* Tex. R. App. P. 38.1(i) (providing that a brief must contain appropriate citations to authorities); *Hall*, 919 S.W.2d at 467; *see also Fredonia State Bank*, 881 S.W.2d at 284–85.

[63]*See, e.g.*, Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Family & Probate* PJC 200.8 (2016).

[64]*See* Tex. R. App. P. 44.1(a).

[65]*See* Tex. Fam. Code Ann. § 105.005 (West 2014); *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

[66]*See R.R.*, 209 S.W.3d at 116.

he cites no authority for the proposition that excluding the statement from the jury charge is an abuse of discretion.[67]  We overrule Father's seventh issue.

## V.  Jury Size

In his eighth issue, Father contends that the trial court reversibly erred by denying his request for a twelve-person jury, violating his constitutional rights to equal protection and due process.  Father did not raise an equal protection complaint in the trial court.  He has therefore forfeited that part of his issue,[68] and this court has already rejected a due process challenge to the government code's provision allowing a termination case in Parker County to be heard by a jury of six members.[69]  We overrule Father's eighth issue.

## VI.  Ineffective Assistance of Mother's Counsel at Trial

In her fifth issue, Mother contends that her trial counsel provided ineffective assistance of counsel by failing to object to (1) the two alleged improper comments that the trial court made when Father was testifying and when Father's counsel was objecting, as discussed in her third issue; (2) Bullock's alleged hearsay testimony discussed in Mother's fourth issue as well as

---

[67]*See* Tex. R. App. P. 38.1(i); *Hall*, 919 S.W.2d at 467; *see also Fredonia State Bank*, 881 S.W.2d at 284–85.

[68]*See* Tex. R. App. P. 33.1(a), (b); *Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

[69]*See In re G.C.*, 66 S.W.3d 517, 524–27 (Tex. App.—Fort Worth 2002, no pet.).

the cumulative evidence offered through other witnesses of the children's out-of-court statements; and (3) TDFPS's closing argument allegedly stating that Mother had testified that she would reunite with Father if her parental rights were not terminated and that there was no reason that she should not. To prove ineffective assistance, Mother must show that her trial counsel's performance was so deficient that it denied her a fair trial whose result was reliable.[70]

### A. Alleged Improper Comments

We have held that given the totality of the evidence against Father, Father has not shown that the comment of the trial court, "Don't forget to say it's very prejudicial to your client," probably caused the rendition of an improper judgment against Father.[71] We therefore also hold that Mother's trial counsel's failure to object to it likewise did not harm Mother's case.[72] As to the trial court's comment regarding Father's testimony about the tattoo, Mother cannot show that that comment, in light of the evidence of all the other abuse that she and her children suffered at Father's hands, harmed her case or deprived her of a fair trial.[73]

---

[70]See In re J.O.A., 283 S.W.3d 336, 341–42 (Tex. 2009) In re M.S., 115 S.W.3d 534, 545 (Tex. 2003); see also Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).

[71]See Tex. R. App. P. 44.1(a); M.R.J.M., 280 S.W.3d at 501 n.7; Metzger, 892 S.W.3d at 39.

[72]See Tex. R. App. P. 44.1(a).

[73]See M.S., 115 S.W.3d at 545; see also Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.

## B. Evidence of the Children's Out-of-Court Statements

Mother complains that her trial counsel was ineffective for failing to properly object to the testimony of several witnesses, including Bullock, regarding the children's out-of-court statements recounting abuse. Mother does not complain of her trial counsel's failure to object to TDFPS's Exhibit 7, which contains the brunt of the damaging information relayed in the children's out-of-court statements to Bullock and other witnesses. That exhibit was admitted without objection during Father's testimony and before all the other witnesses testified. Because the damaging evidence was already admitted through Exhibit 7 and because Mother does not complain of the admission of that exhibit, we cannot say that the later admission of the same or similar evidence from other sources harmed her case.[74] Accordingly, we conclude and hold that Mother has not shown ineffective assistance—that she was deprived of a fair trial with a reliable result—because she has not shown any prejudice to her defense from the alleged failures of her trial counsel to object to identified testimony and evidence.[75]

---

[74]*See* Tex. R. App. P. 44.1(a); *Bay Area Healthcare Grp., Ltd.*, 239 S.W.3d at 235; *Volkswagen of Am., Inc.*, 159 S.W.3d at 907.

[75]*See M.S.*, 115 S.W.3d at 545; *see also Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

## C. Closing Argument

Mother testified that she asked Father to move back home a couple of weeks after a magistrate issued an emergency protective order against him because she needed help with their children.  Mother also testified,

> Q.  . . . .  If these children are returned to your care are you going to reside with [Father]?
>
> A.  If—if the court doesn't want me to I won't.
>
> [Ad litem]: Objection, Your Honor.  Nonresponsive.
>
> Q.  . . . What is your plan if these children are returned to you?  Do you intend to live with [Father]?
>
> A.  No.
>
> Q.  When did he move out?
>
> A.  A few weeks ago.
>
> Q.  How long have your children been in care?
>
> A.  Since April of 2014.
>
> Q.  What are your plans for the children if they're returned to your care as far as living arrangements?  Where do you intend to live with them?
>
> A.  In the apartment?
>
> Q.  You and [Father] in the same apartment?
>
> A.  I'm sorry?
>
> Q.  You and [Father] with them in the same apartment?
>
> A.  He already moved out.
>
> . . . .
>
> [Q.] (BY [TDFPS Counsel]) Why are you separated now?

39

> A. Well, I guess we see how the case is going so we need to separate. We're trying to do this together.
>
> Q. So in the last few weeks you decided it might be better if you split up?
>
> A. Yes.

Father testified that he had left the couple's home "maybe two[ or] three weeks" before trial and that he and Mother were "basically doing everything [they could] to get the kids back." He stated that if he "ha[d] to move out so she [could] get them, at least they[ would] be with her." "It's something that [Father and Mother] just came up with."

In TDFPS's closing argument, counsel argued,

> These children are in foster care due to the abuse and the neglect of the parents. The abuse by [D]ad, and the neglect, neglectful supervision by [M]om by leaving the kids with [D]ad. And not doing anything when the kids say hey, [D]ad puts us in the dryer. Don't do that.
>
> Who did she choose? Who has she chosen in this case? She chooses [Father].
>
> Could I have left at any time? I could have. Fifteen months later, all right. I guess we're going to separate. Why are you going to separate 15 months later? What's the point? You don't admit anything happened, why would you separate? Why would you live in separate houses? Why would he go somewhere else? Fifteen months later, September 1st, he moves out.
>
> What are you going to do if the kids come back you to, [Mother]? I'm going to get back with [Father]. There's no reason I shouldn't.

Control of counsel's conduct during jury argument rests in the sound discretion of the trial court.[76] The test for improper jury argument is whether the argument could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have agreed but for the argument.[77] Reasonable inferences and deductions from the evidence are allowed in closing argument, as is hyperbole.[78] Reversal is required only when the entire record shows that the jury argument was improper, uninvited and unprovoked, preserved by a timely objection, and incurable by instruction, withdrawal, or trial court reprimand.[79] Further, an appellant must show that the argument constituted harmful error by its nature, degree, and extent.[80]

Given the evidence of Father's multiple instances of abuse of Mother, of Mother's knowledge of his abuse of the children, and of Mother's remaining with Father until separating strategically only right before trial, we hold that TDFPS's

---

[76] *Richmond Condos. v. Skipworth Commercial Plumbing, Inc.*, 245 S.W.3d 646, 667–68 (Tex. App.—Fort Worth 2008, pet. denied) (op. on reh'g); *Wells v. HCA Health Servs. of Tex., Inc.*, 806 S.W.2d 850, 854 (Tex. App.—Fort Worth 1990, writ denied); *see also* Tex. R. Civ. P. 269.

[77] *See Richmond Condos.*, 245 S.W.3d at 667–68.

[78] *See Walls v. Klein*, No. 04-13-00565-CV, 2014 WL 3339791, at *1 (Tex. App.—San Antonio July 9, 2014, pet. denied) (mem. op.).

[79] *See id.* at 668; *see also Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979).

[80] *Standard Fire*, 584 S.W.2d at 839; *Richmond Condos.*, 245 S.W.3d at 668; *see* Tex. R. App. P. 44.1(a).

argument that Mother would return to Father should the children be returned to her was a reasonable inference from the evidence and not improper.[81] Mother's trial counsel therefore properly did not object to it.

### D. No Ineffective Assistance Proved

Because Mother did not prove ineffective assistance of counsel at trial in any of the three categories she identified, we overrule her fifth issue. Because Father has demonstrated no standing to complain that Mother's trial counsel was ineffective, we overrule his adoption of Mother's fifth issue.[82]

## VII. Conclusion

Having overruled Mother's dispositive issues, Father's dispositive issues, and Mother's issues adopted by Father, we affirm the trial court's judgment terminating the parent-child relationships between Mother and each child and between Father and each child.

PER CURIAM

PANEL: DAUPHINOT, GABRIEL, and SUDDERTH, JJ.

DELIVERED: April 7, 2016

---

[81] See Walls, 2014 WL 3339791, at *1.

[82] See Buckholts ISD v. Glaser, 632 S.W.2d 146, 149–50 (Tex. 1982); In re D.C., 128 S.W.3d 707, 717 (Tex. App.—Fort Worth 2004, no pet.).